UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE CORRECTIONAL OFFICERS      )
AND POLICE BENEVOLENT ASSOCIATION, INC.,  )
THOMAS HANNAH, individually and on behalf of all   )
others similarly situated, CHLOE HAYES, individually  )
and on behalf of all others similarly situated,   )
ERIK MESUNAS, individually and on behalf of all others  )
similarly situated, KERRI MONTGOMERY, individually  )
and on behalf of all others similarly situated,   )
SARAH TOMPKINS, individually and on behalf of all   )
others similarly situated, ALEXANDER VOITSEKHOVSKI,  )
individually and on behalf of all others similarly situated, and  )
JOHN and JANE DOES 1 – 18,000    )

**CLASS ACTION
COMPLAINT FOR
DEPRIVATION OF
RIGHTS (42 U.S.C. § 1983)**

**Case No.** 1:21-cv-535 (MAD/CFH)

Plaintiffs,

-- against --

ANDREW CUOMO, in his official capacity as
Governor of the State of New York,
STATE OF NEW YORK,
NEW YORK STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION, and
ANTHONY ANNUCCI, in his official capacity as
Acting Commissioner of the New York State Department of
Corrections and Community Supervision

Defendants.

------------------------------------------------------------------------

## **NATURE OF ACTION**

1.      This is a civil rights action for legal and equitable remedies challenging the policies,

practices, and/or customs related to segregated confinement of incarcerated individuals in New

York prisons, and the enactment of the Humane Alternatives to Long-Term Solitary Confinement

1

Act (HALT) by Defendant New York State and Defendant Andrew Cuomo, and as enforced by Defendant New York State Department of Corrections and Community Supervision and Defendant Anthony Annucci.

2.      This action seeks declaratory and injunctive relief for deprivations sustained by Plaintiffs, and for violations committed by Defendants, acting under color of State law, against Plaintiffs' rights as guaranteed by the Fourteenth Amendment of the United States Constitution.

## PARTIES

3.      Plaintiff New York State Correctional Officers and Police Benevolent Association, Inc., ("NYSCOPBA") is, at all times relevant to this matter, the certified collective bargaining representative for the Security Services Unit of New York State employees which includes, among other titles, approximately 18,000 employees holding the title of "Correction Officer" or "Correction Sergeant" employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), and has associational standing to bring this action.

4.      Plaintiff Thomas Hannah, at all relevant times to this matter, is over the age of eighteen, and is a Correction Sergeant employed by Defendants New York State and DOCCS at Southport Correctional Facility.

5.      Plaintiff Chloe Hayes, at all relevant times to this matter, is over the age of eighteen, and is a Correction Officer employed by Defendants New York State and DOCCS at Greene Correctional Facility.

6.      Plaintiff Erik Mesunas, at all relevant times to this matter, is over the age of eighteen, and is a Correction Officer employed by Defendants New York State and DOCCS at Clinton Correctional Facility.

7. Plaintiff Kerri Montgomery, at all relevant times to this matter, is over the age of eighteen, and is a Correction Sergeant employed by Defendants New York State and DOCCS at Coxsackie Correctional Facility.

8. Plaintiff Sarah Tompkins, at all relevant times to this matter, is over the age of eighteen, and is a Correction Officer employed by Defendants New York State and DOCCS at Green Haven Correctional Facility.

9. Plaintiff Alexander Voitsekhovski, at all relevant times to this matter, is over the age of eighteen, and is a Correction Officer employed by Defendants New York State and DOCCS at Coxsackie Correctional Facility.

10. Defendant New York State ("State") is a sovereign State of the United States of America. The State is, at all times relevant to this matter, subject to the Constitution of the United States of America.

11. Defendant Andrew Cuomo ("Cuomo,") at all relevant times to this matter, is the head of the State of New York, the head of the executive branch of the state government, and a natural person and agent of the State holding the title of Governor. As such, he is the final policymaker who has adopted, promulgated, implemented, sanctioned and/or continued the detrimental laws, rules, regulations, policies, practices and/or customs at issue in this action. Defendant Cuomo's official place of business is the State Capitol Building, City of Albany, State of New York. Defendant Cuomo is sued in his official capacity.

12. Defendant New York State Department of Corrections and Community Supervision ("DOCCS"), is a Department within the Executive Branch of the New York State Government and is the appointing authority for all persons employed by it, and is charged with the responsibility and is delegated the power, under New York State law, to ensure the care, custody

and control of persons housed within its facilities who are convicted of crimes and sentenced to more than one year in prison. DOCCS operates fifty (50) correctional facilities throughout the State of New York. DOCCS' principal place of business is 1220 Washington Ave. #9, City of Albany, State of New York.

13.     Defendant Anthony Annucci ("Annucci") at all relevant times to this matter, is the head of Defendant New York State Department of Corrections and Community Supervision, and a natural person and agent of the State holding the title of Acting Commissioner of DOCCS. As such, he is DOCCS' contact for the New York State Legislature and is charged with implementing enacted legislation, along with other rules, regulations, policies, practices and/or customs within DOCCS. Defendant Annucci's principal place of business is 1220 Washington Avenue #9, City of Albany, State of New York. Defendant Annucci is sued in his official capacity.

## JURISDICTION AND VENUE

14.     This action implicates federal questions under the Fourteenth Amendment to the United States Constitution and pursuant to federal law, 42 U.S.C. § 1983.

15.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

16.     This Court has authority to grant the requested injunctive relief pursuant to 28 U.S.C. § 1343 (3), declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Plaintiffs' demand for costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

17.     Venue is proper in the Northern District pursuant to 28 U.S.C. § 1391, as at least one defendant resides in the District and all Defendants reside within the State of New York.

4

## INTRODUCTION

18.     Since 2012, Defendants State of New York, Cuomo, DOCCS and Annucci (collectively "Defendants") have continued, promulgated, implemented, adopted or sanctioned certain laws, rules, regulations, policies, practices and/customs to significantly limit the use of segregated confinement of incarcerated individuals in State prisons as a corrective and security tool.  These policies purport to limit isolation for incarcerated individuals serving sanctions in prison for dangerous and disruptive disciplinary infractions.  However, these policies diminish accountability for those incarcerated individuals who commit violent acts while in prison, and create a dangerous living and working environment by permitting those incarcerated individuals who have shown a propensity to violently assault peaceful incarcerated individuals and/or State employees to be placed in congregate settings where they are easily able to repeat such violent acts.  These policies willingly neglect the safety of the hardworking men and women who serve as Correction Officers and Correction Sergeants in State prisons, and further neglect the safety of incarcerated individuals in the general population of State prisons who are attempting to serve out their sentences peacefully.

19.     Defendants' actions have empowered the most violent incarcerated individuals and drastically increased the threat that they pose to Correction Officers and Correction Sergeants beyond what is considered a typical risk of exposure to violence that is inherent in these job titles. As a result, Correction Officers and Correction Sergeants have, with greater frequency than ever before, been violently assaulted on duty—punched, kicked, slashed, beaten, sexually assaulted, knocked unconscious, or had blood, urine and feces thrown on them by incarcerated individuals. According to Defendants' data, since limiting the use of segregated confinement starting in 2012, incarcerated individual assaults against employees has increased by 99.8 percent, and incarcerated

individual assaults against other incarcerated individuals has increased by 84.6 percent—all while the incarcerated individual population statewide has decreased by 36.4 percent. The increase in assaults in State prisons are staggering, because Defendants' policies, and now Defendants' enactment of HALT, limits the use of segregated confinement to such an extreme extent so as to allow the most violent incarcerated individuals in prison to remain almost exclusively in congregate living settings with constant access to employees and other incarcerated individuals that they can, and do, victimize.

20.     Moreover, pursuant to statistics gathered by the Department of Labor Bureau of Labor Statistics for 2019 and the Department of Justice Statistics for 2019, staff working in correctional facilities operated by Defendant DOCCS suffered 21.4percent of the nationwide assaults on staff, despite only housing 3.5percent of the incarcerated individual population across state-operated correctional facilities nationwide. Annexed hereto as **Exhibit A** is a true and accurate copy of the 2019 Bureau of Labor Statistics and Department of Justice Statistics.

21.     These assaults result from Defendants' collective actions that have created and/or increased the dangers Correction Officers and Correction Sergeants face in the workplace, as well as increased the dangers faced by incarcerated individuals in the general population of State prisons who are attempting to serve out their sentences peacefully. By removing or limiting violence deterrence and separation-related security measures such as segregated confinement, and implementing alternative therapeutic programs that fail to provide accountability for incarcerated individuals' actions and separation from the general incarcerated individual population, Defendants have created a substantial and imminent risk that Correction Officers, Correction Sergeants and non-violent incarcerated individuals will be seriously injured and/or killed. Such risk of harm is beyond that inherent in the profession.

22.     Notwithstanding the surging violence in State prisons as segregated confinement has been restricted over the past eight (8) years, Defendants passed the Humane Alternatives to Long-Term Solitary Confinement Act ("HALT") on March 18, 2021, for the purpose of further restricting the use of segregated confinement in correctional facilities operated by Defendant DOCCS more than ever before in this State, even for the most violent incarcerated individuals. Defendant Governor Andrew Cuomo signed the HALT bill into law on March 31, 2021, as Chapter 93 of the Laws of 2021.

23.     In enacting HALT, Defendants have created a substantial and imminent risk that Correction Officers, Correction Sergeants and non-violent incarcerated individuals will be seriously injured or killed.

24.     The Fourteenth Amendment of the United States Constitution guarantees public employees a substantive due process right to be free from state-created danger.

25.     Here, Plaintiffs enjoy the right to be free from Defendants' laws, rules, regulations, policies, practices and/or customs that create an unreasonable risk of bodily harm or death from third parties, like violent incarcerated individuals.  Defendants' laws, rules, regulations, policies, practices and/or customs have been continued, adopted, promulgated, implemented or sanctioned as apparent reform necessary to limit extended periods of isolation deemed potentially detrimental to incarcerated individual rehabilitation.  However, this 'reform' shows a deliberate and callous indifference to the lives and safety of Correction Officers, Correction Sergeants and peaceful incarcerated individuals in the general population of State prisons that shocks the contemporary conscience.  Defendants' conduct, as evidenced by the State's own assault statistics, has created and/or increased dangers in State prisons, which present a substantial and imminent risk of serious bodily injury, including possible death, to Correction Officers and Correction Sergeants.

26.     Defendants are aware and have knowledge of the dramatic increase in violence throughout the implementation of increasingly lenient policies towards violent and disruptive misconduct.  Defendant DOCCS publishes annual reports and statistics of assaults on incarcerated individuals by other incarcerated individuals, assaults on staff by incarcerated individuals, and prison population numbers, among numerous other statistics.  All statistics and data provided for in this complaint are sourced directly from the statistics and data made publicly available by Defendant DOCCS through its website and data provided over the years by Defendant DOCCS directly to NYSCOPBA.

27.     Defendants have acted in reckless and conscious disregard of the increased violence towards their own employees and rule-abiding incarcerated individuals by continuing to implement increasingly counterproductive, lenient policies towards violent and disruptive misconduct that fail to adequately deter such behavior and fail to adequately separate and secure those violent criminals from staff and the general population of incarcerated individuals.

28.     The harm to life and limb of Correction Officers and Correction Sergeants that has been and will continue to occur constitutes irreparable harm and shocks the contemporary conscience, as the injuries that have already been sustained under lenient incarcerated individual discipline will only increase after the implementation of the increased leniency of HALT, and has gone beyond the pale of the inherent risk of working in a prison setting.

29.     Plaintiffs NYSCOPBA, the Individual Plaintiffs and Plaintiffs John and Jane Does 1 – 18,000, (collectively, "Plaintiffs") bring this civil rights action to challenge Defendants laws, rules, regulations, policies, practices and/or customs that have created extremely dangerous conditions in the workplace and/or increased the risk of harm to Plaintiffs.

8

30.     Plaintiffs seek declaratory judgment, injunctive relief, an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just, to remedy the ongoing and continuous violation of NYSCOPBA members' rights, the rights of the Individual Plaintiffs and the class members as secured by 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

31.     To properly remedy these ongoing and continuous constitutional violations, the Individual Plaintiffs seek to represent a certified class of affected plaintiffs.

32.     The Individual Plaintiffs, individually and on behalf of the class, seek a class-wide judgment declaring that Defendants' laws, rules, regulations, policies, practices and/or customs described herein have and continue to, given the totality of the circumstances, violate the constitutional rights of the class members.

33.     The Individual Plaintiffs further request a class-wide injunction preventing the Defendants from continuing such laws, rules, regulations, policies, practices and/or customs.

34.     In addition, Plaintiffs seek an award of attorneys' fees and costs, and such other relief as this Court deems equitable and just.

**FACTUAL BACKGROUND**

**Definitions for purposes of the Complaint**

35.     For purposes of this Complaint, the term "segregated confinement" shall mean confinement of an incarcerated individual to a cell in a special housing unit, a cell in a separate keeplock unit, or the incarcerated individual confinement in keeplock status in the incarcerated individual's current cell.

36.     For purposes of this Complaint, the term "special housing unit" ("SHU") shall mean a specialized cell in a separate unit of like cells that house incarcerated individuals serving

disciplinary sanctions for serious misconduct, which provide for more limited access to property and privileges due to the severity of the actions warranting the sanction.

37.    For purposes of this Complaint, the term "separate keeplock unit" shall mean a specialized cell in a separate unit of like cells that house incarcerated individuals serving disciplinary sanctions for lesser misconduct, which provide for full access to incarcerated individual property and more privileges than special housing units due to the severity of the actions warranting the sanction.

38.    For purposes of this Complaint, the term "keeplock status" shall mean the confinement of an incarcerated individual to his current cell with all of his property, with some limitations on the full complement of privileges, due to the severity of the actions warranting the sanction.

**Since Defendants instituted broad changes limiting segregated confinement in New York prisons starting in 2012, as a result of the *Peoples v. Annucci* litigation, the number of violent assaults inside of prisons has increased by nearly 100 percent.**

39.    Prior to 2012, Defendant DOCCS (at the time, the Department of Correctional Services) implemented segregated confinement at its various facilities through its own regulations and directives.

40.    At all times relevant herein, segregated confinement was implemented as a security and corrective discipline tool when incarcerated individuals engaged in moderate to severe misconduct, and as a means to protect peaceful, rule-abiding incarcerated individuals from those violent criminals who would seek to harm them for personal gain within the correction setting.

41.    In 2012, and even prior, the population of incarcerated individuals in the custody of DOCCS was far greater than it is today, and the use of segregated confinement in its then-

current form helped ensure that the number of assaults on incarcerated individuals and assaults on staff, though still high, remained stable, and much lower than it is today.

42.    In 2012, approximately 54,865 incarcerated individuals in sixty-one facilities were in the custody of DOCCS.

43.    In 2012, there were approximately 652 incarcerated individual-on-incarcerated individual assaults and 524 incarcerated individual-on-staff assaults in New York State prisons.

44.    By 2020, there were approximately 34,446 incarcerated individuals in fifty-two facilities in the custody of DOCCS.  However, in 2020, there were approximately 1,204 incarcerated individual-on-incarcerated individual assaults and 1,047 incarcerated individual-on-staff assaults.  Therefore, despite a 37.2percent reduction in incarcerated individual population, the number of assaults that occurred inside of New York State prisons doubled.

**NYLCU (*Peoples v. Annucci*) Settlement**

45.    Upon information and belief, the increase in violence directly correlates to and was caused by changes to segregated confinement made by Defendant DOCCS, as a result of the filing of the class action lawsuit Leroy Peoples, et al v. Anthony Fischer, et al (N.D.N.Y. April 14, 2016) (11-cv-2694) in 2011 (renamed Peoples, et al v. Annucci, et al) in the United States District Court for the Southern District of New York.

46.    The Peoples v. Annucci class action lawsuit alleged, in pertinent part, that Defendant DOCCS violated the Eighth Amendment and Fourteenth Amendment rights of incarcerated individuals to be free from cruel and unusual punishment when it sought to confine them, and countless others, to months and years in segregated confinement for seemingly non-threatening infractions.  The Peoples v. Annucci complaint alleged that the conditions in isolation

11

during segregated confinement were physically and mentally damaging to the rehabilitation of incarcerated individuals.

47.     Upon information and belief, as early as 2012, Defendant DOCCS became aware of the likelihood of the success of the Peoples v. Annucci lawsuit against it for violation of incarcerated individuals' Eighth Amendment rights due to their policies, practices, and procedures relating to placement of incarcerated individuals in segregated confinement.

48.     On May 3, 2012, the court allowed the Eighth Amendment claims to go forward, holding that a placing a person in SHU for two years might constitute cruel and unusual punishment. Peoples v. Fischer, 20212 WL 1575302, at *9 (S.D.N.Y. May 3, 2012), on reconsideration in part, 898 F. Supp 2d 618 (S.D.N.Y. 2012) (1:11-CV-02694).

49.     On June 26, 2012, U.S District Court Judge Shira Scheindlin indicated in a ruling on a motion to reconsider that "placement in the SHU for such a time period was grossly disproportionate to the non-violent violation that he was found to have committed. [Plaintiff Leroy Peoples] has therefore stated a plausible claim that defendants violated his Eighth Amendment right to be free from cruel and unusual punishment." Peoples v. Fischer (1:11-CV-02694).

50.     On August 23, 2012, the New York Civil Liberties Union ("NYCLU") filed an appearance to represent the plaintiff and amended the complaint to include other similarly situated plaintiffs.

51.     According to the New York State Assembly Committee on Correction's Annual Report for 2012, in September 2012, Defendant DOCCS began an internal review of its SHU policies with plans to produce recommendations as to changes needed in placements and lengths of stay in SHU.

52.     On February 19, 2014, the parties to <u>Peoples v. Annucci</u> agreed to a stipulated stay of the litigation, during which the parties would work to reform Defendant DOCCS's segregated confinement system via preliminary settlement. The parties began to implement the preliminary settlement at that time. The settlement is commonly referred to as the "NYCLU settlement," due to the New York Civil Liberties Union's legal representation of many of the plaintiffs, and shall be referred to herein as the "NYCLU settlement."

53.     The resultant NYCLU settlement provided for, in pertinent part, a reduction in the number of incarcerated individuals who could be placed in segregated confinement by eliminating it as a secure corrective punishment option for many rules violations; the establishment of guidelines limiting the number of days incarcerated individuals could be sentenced to segregated confinement for each remaining rule violation; the institution of time cuts for incarcerated individuals in segregated confinement; the creation of a metric for early release from segregated confinement; and the creation of a mechanism for implementing and enforcing the changes over a five-year period.

54.     After the preliminary and final NYCLU settlements were reached and implemented, those changes, plus numerous other changes to segregated confinement, created a correction environment that is unsafe and overly lenient in responding to instances of dangerous incarcerated individual misconduct and violence.

55.     As the correction environment became more lenient to violence and misconduct, the incarcerated individual population became more dangerous due to a higher proportion of incarcerated individuals who have been convicted of violent felonies from 2009–2019, pursuant to the 2019 Under Custody Report published by Defendant DOCCS. Annexed hereto as **Exh. B** is a true and accurate copy of the 2019 Under Custody Report.

56.     Upon information and belief, the higher proportion of violent felony offenders in Defendant DOCCS facilities is due to drug law reforms enacted in 2009 that resulted in a seventy-three (73) percent reduction by 2019. **Exh. B, p. 20**.

57.     Upon information and belief, as of January 1, 2019, the latest statistics available, sixty-six (66) percent of the incarcerated individuals in Defendant DOCCS facilities were convicted of a violent felony offense. **Exh. B, p. 20**.

58.     In 2011, incarcerated individuals convicted of a violent felony offense constituted 79.2 percent of the population in maximum security correctional facilities operated by Defendant DOCCS.

59.     In 2021, the percentage of incarcerated individuals convicted of a violent felony offense increased to 86.4 percent of the population in maximum security correctional facilities operated by Defendant DOCCS.

60.     This constitutes a 7.2 percent increase in density of the population of incarcerated individuals who are convicted of violent offenses and are housed in maximum security correctional facilities operated by Defendant DOCCS.

61.     In 2011, incarcerated individuals convicted of a violent felony offense constituted 54.6 percent of the population in medium security correctional facilities operated by Defendant DOCCS.

62.     In 2021, the percentage of incarcerated individuals convicted of a violent felony offense increased to 65.8 percent of the population in medium security correctional facilities operated by Defendant DOCCS.

63.     This constitutes an 11.2 percent increase in density of population of incarcerated individuals who are convicted of violent offenses and are housed in medium security correctional facilities operated by Defendant DOCCS.

64.     Despite these statistics and trends, Defendant DOCCS has continued to create an environment increasingly tolerant of violent and disruptive misbehavior by reducing usage of segregated confinement and placing those who engage in violence and disruption in social settings with other violent criminals who have engaged in the same acts within the prison system.

65.     Status reports published by Defendant DOCCS indicate reductions in incarcerated individuals confined to segregated confinement pursuant to disciplinary sanctions as a result of misconduct and overall time spent in segregated confinement.

66.     As a result of the NYCLU settlement, including, but not limited to, the sentencing guidelines and time cuts, incarcerated individuals began to serve less time in segregated confinement for engaging in varying forms of misconduct. Annexed hereto as **Exh. C** is a true and accurate copy of data provided by NYCLU regarding length of time served in SHU after and as a result of the NYCLU settlement, which are discussed more fully below.

**The reduction in the use of segregated confinement as a disciplinary and security tool**

67.     In 2015, after the first year of the preliminary NYCLU settlement, the incarcerated individual population was 52,363. Approximately 419 incarcerated individuals received sanctions of fifteen (15) days or less in segregated confinement; 1,146 incarcerated individuals received sanctions of 16–30 days; 2,675 incarcerated individuals received sanctions of 31–60 days; 3,845 incarcerated individuals received sanctions of 61–90 days; 3,459 incarcerated individuals received sanctions of 91–180 days; 991 incarcerated individuals received sanctions of 181–364 days; and 286 incarcerated individuals received sanctions of at least 365 days. **Exh. C.**

68.     In 2016 and 2017, the length of sanctions continued to reflect increased leniency pursuant to the NYCLU settlement such that fewer segregated confinement sanctions were handed down and those sanctions that were handed down included less time in segregated confinement. *See* **Exh. C**.

69.     By 2018, when the incarcerated individual population was 47,459, approximately 532 incarcerated individuals received sanctions of fifteen (15) days or less in segregated confinement; 1,108 incarcerated individuals received sanctions of 16–30 days; 3,049 incarcerated individuals received sanctions of 31–60 days; 3,108 incarcerated individuals received sanctions of 61–90 days; 2,045 incarcerated individuals received sanctions of 91–180 days; 480 incarcerated individuals received sanctions of 181–364 days; and 131 incarcerated individuals received sanctions of at least 365 days. **Exh. C**.

70.     From 2016–2019, Defendant DOCCS continued to implement policies, procedures and customs which drastically reduced the use of segregated confinement.

71.     From 2016–2019, policies implemented by Defendant DOCCS reduced the number of incarcerated individuals serving SHU sanctions in SHU cells by 42percent and shortened the length of stay in an SHU cell by 31percent. Annexed hereto as **Exh. D** is a true and accurate copy of the 2019 Annual SHU Update published by Defendant DOCCS.

72.     In 2019, policies implemented by Defendant DOCCS reduced the number of incarcerated individuals serving keeplock sanctions in SHU by 28percent. **Exh. D, p. 2.**

73.     In 2019, policies implemented by Defendant DOCCS reduced the number of incarcerated individuals between the ages of 18–21 in SHU by 60percent. **Exh. D, p. 2**.

74.     In 2019, policies implemented by Defendant DOCCS reduced the median SHU stay for an incarcerated individual by 27percent (from 59 days to 43 days). **Exh. D, p. 2**.

75.    In 2019, policies implemented by Defendant DOCCS reduced the median keeplock stay for an incarcerated individual by 24percent (from 25 days to 19 days).  **Exh. D, p. 2.**

76.    In 2020, pursuant to Defendant DOCCS's Annual SHU Update, Defendant DOCCS declared that it was taking measures that go above and beyond the measures provided for in the NYCLU settlement in order to further reduce the use of segregated confinement on the prison population.  Annexed hereto as **Exh. E** is a true and accurate copy of the 2020 Annual SHU Update published by Defendant DOCCS.

77.    By the end of 2020, policies implemented by Defendant DOCCS resulted in the elimination of over forty (40) disciplinary infractions that had previously qualified for segregated confinement.  Among the infractions eliminated were incarcerated individual use and possession of alcohol and the use of illegal narcotics.

78.    By the end of 2020, policies implemented by Defendant DOCCS had reduced the number of incarcerated individuals serving SHU sanctions in SHU by 58percent.  **Exh. E, p. 1.**

79.    By the end of 2020, policies implemented by Defendant DOCCS had reduced the number of incarcerated individuals housed in an SHU cell by 50percent.  **Exh. E, p. 1**.

80.    By the end of 2020, policies implemented by Defendant DOCCS had reduced the number of incarcerated individuals serving a keeplock sanction in an SHU cell by 58percent.  **Exh. E, p. 1**.

81.    By the end of 2020, policies implemented by Defendant DOCCS had reduced the number of incarcerated individuals under the age of twenty-two (22) housed in an SHU cell by 72percent.  **Exh. E, p. 2**.

82.     By the end of 2020, policies implemented by Defendant DOCCS had reduced the median length of stay for an incarcerated individual serving an SHU sanction in an SHU cell by 20percent. **Exh. E, p. 2**.

83.     By the end of 2020, policies implemented by Defendant DOCCS "[l]imit[ed] the placement of incarcerated individuals in segregated confinement for serious misconduct that creates significant risk to the safety and security of the correctional facilities and the individuals within." **Exh. E, p. 2**.

84.     In other words, DOCCS acknowledges that the limitations it has imposed on segregated confinement through the NYCLU settlement have effectively placed incarcerated individuals who pose a significant threat to the safety of others back into the general population of the facility, with direct access to Plaintiffs who are attempting to do their jobs safely and incarcerated individuals attempting to serve their sentences peacefully.

**As the use of segregated confinement decreased, violent assaults on staff and other incarcerated individuals increased**

85.     As the leniency and tolerance for incarcerated individual misconduct and misbehavior increased starting in 2012, the violence against other incarcerated individuals and staff began to increase.

86.     By way of background, in 2012, when the incarcerated individual population was 54,865, there were approximately 524 incarcerated individual assaults on staff and 652 incarcerated individual assaults on other incarcerated individuals. Annexed hereto as **Exh. F** is a graph depicting incarcerated individual population numbers, incarcerated individual assault on staff numbers and incarcerated individual assault on incarcerated individual numbers from 2012–2020, plus supporting raw data.

87.     In 2013, when the incarcerated individual population was 54,152, there were approximately 645 assaults on staff and 767 assaults on other incarcerated individuals. **Exh. F**.

88.     In 2014, the first year of the implementation of the preliminary NYCLU settlement, the incarcerated individual population was approximately 53,103, and there were 747 incarcerated individual assaults on staff and 860 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

89.     In 2015, when the incarcerated individual population was 52,344, there were approximately 895 incarcerated individual assaults on staff and 917 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

90.     In 2016, when the incarcerated individual population was 51,466, there were approximately 759 incarcerated individual assaults on staff and approximately 1,135 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

91.     In 2017, when the incarcerated individual population was 50,271, there were approximately 799 incarcerated individual assaults on staff and approximately 1,224 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

92.     In 2018, when the incarcerated individual population was 47,459, there were approximately 972 incarcerated individual assaults on staff and 1165 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

93.     In 2019, when the incarcerated individual population was 44,334, there were approximately 1,033 incarcerated individual assaults on staff and 1265 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

94.     In 2020, when the incarcerated individual population was 34,446, a drastic reduction of 10,000 incarcerated individuals from the year prior, there were approximately 1,047

incarcerated individual assaults on staff and 1204 incarcerated individual assaults on other incarcerated individuals. **Exh. F**.

95. This represents an increase in assaults on staff of 99.8 percent and an increase of assaults on incarcerated individuals of 84.6 percent over the course of eight (8) years (from 2012 through 2020).

96. In December 2020, Defendant DOCCS and Defendant Annucci promulgated regulations that, once in effect, would further limit the types of offenses that could lead to an incarcerated individual being placed in segregated confinement, would entitle incarcerated individuals to time cuts, created two segregated confinement alternative units that provided for quasi-general population congregate settings for incarcerated individuals (the Residential Rehabilitation Unit and the Step-Down Unit), and limited segregated confinement to a maximum of thirty (30) days.

97. Upon information and belief, the "congregate setting" of these alternative units proposed by the December 2020 regulations contemplated allowing incarcerated individuals to interact freely with one another with mild supervision, without mechanical restraints, and without restriction.

98. The proposed RRU was slated to be a segregated confinement alternative that still confined incarcerated individuals for approximately 18–20 hours per day in their cells, but also provided them out-of-cell time, programming, and recreation with other incarcerated individuals in the most congregate setting allowable.

99. The proposed Step-Down Unit was slated to be a more secure and restrictive alternative to the Residential Rehabilitation Unit for those incarcerated individuals who were deemed by their own actions to be too disruptive to the congregate settings of the RRU. The

proposed Step-Down Unit would still provide for congregate settings and hours of daily out-of-cell time, but in a way that further restricted them to their cells and separated them from RRU incarcerated individuals who would abide by the terms of the RRU and its programs.

100.   Prior to the December 2020 regulations taking effect, the New York State Legislature passed, and Defendant Cuomo signed into law, the Humane Alternative to Long-Term Segregated Confinement ("HALT") bill.  As set forth further herein, HALT provides even greater leniency to incarcerated individuals who engage in repeated acts of violence than the December 2020 regulations promulgated by Defendant DOCCS had contemplated.

**Segregated Confinement is improperly synonymized with punitive solitary confinement; punitive solitary confinement does not exist in New York State prisons**

101.   The impetus for the drastic changes made to segregated confinement since 2012 was, in part, the Peoples v. Annucci lawsuit; however, it gained significant momentum in the public sphere due to the "torture" comparison made in the media and by the United Nations.

102.   On December 17, 2015, the United Nations adopted a resolution that, in pertinent part, declared "prolonged solitary confinement," which is defined as 22–24 hours per day confined to a cell for fifteen (15) consecutive days, as "torture."  These became known as the Nelson Mandela Rules.  United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), G.A. Res. 70/175, ¶ 43-44, U.N. Doc. A/RES/70/175 (Dec. 17, 2015).

103.   Although that may be the case in some or many countries that are represented at the United Nations, segregated confinement in New York State prisons is much different, and provides a significant degree of amenities, educational and vocation learning opportunities, recreation, and stimulation in the form of computer tablets that have access to email, phone calls, movies, music, books, and periodicals.

104.   Despite these facts, mass media and popular culture is fraught with misrepresentations about segregated confinement—torture, isolation, solitary, cruel and unusual, inhumane, the box—are some of the words and imagery that are used to describe what results when some incarcerated individuals are separated from the general population of incarcerated individuals in a prison.   What results is not punitive solitary confinement; indeed, solitary confinement does not exist in New York State.

105.   Segregated confinement is the confinement to a special housing unit, keeplock unit or keeplock status for those incarcerated individuals who have been found guilty of criminal and/or disciplinary offenses in prison following a hearing; pre-hearing confinement; protective custody to safeguard incarcerated individuals who are particularly vulnerable to specific harm; or administrative segregation for those incarcerated individuals who pose an unreasonable risk of escape or threat to security. In other words, segregated confinement is a safety tool used to separate certain incarcerated individuals who either pose a threat to others or are particularly vulnerable to harm from the general population of incarcerated individuals.

106.   Special housing units are housing units within a prison where all the incarcerated individuals on the unit are securely separated in their own cells, away from the general incarcerated individual population.

107.   Keeplock units are housing units within a prison where the incarcerated individuals on the unit are confined to their cells.   Keeplock status is a disciplinary status wherein incarcerated individuals in general population housing units are confined to their cells.

108.   Special housing units, keeplock units and keeplock status have been used by Defendant DOCCS to separate incarcerated individuals who engage in disciplinary infractions that

jeopardize the safety of staff and other incarcerated individuals and/or create a disturbance that jeopardizes the security of the facility.

109.    Incarcerated individuals in segregated confinement have access to computer tablets, family and friends, outdoor recreation and in some cases, personal property and the ability to make purchases at the commissary.

110.    Over the past several years, and pursuant to the NYCLU settlement, Defendants have gone to great lengths to improve the conditions in segregated confinement for incarcerated individuals.

111.    Beginning in 2018, Defendant DOCCS issued incarcerated individuals, including those housed in Special Housing Units, a computer tablet and ear buds/headphones which allow up to six (6) hours of phone calls a day for greater access to support from family and friends, as well as educational material, TED talks, music, books and games.  The computer tablets are provided at no cost to the incarcerated individuals.

112.    According to Defendant DOCCS' 2020 Annual Update, in 2020, there were 2,039,237 completed calls from these computer tablets, with an average length of eighteen minutes per call, for a combined total of 35,793,038 minutes spent by incarcerated individuals in special housing units on the phone with friends and family.  Defendant DOCCS touts that research studies have shown that communication by telephone can be as comforting and beneficial as touching or seeing friends and family.  **Exh. E, p. 2**.

113.    Incarcerated individuals are also provided access to a separate computer tablet that allows them to access the facility's law library.

114.    Incarcerated individuals in segregated confinement receive many of the same privileges as incarcerated individuals residing in the general prison population, including sending

23

and receiving correspondence, weekly visits, religious counseling, unlimited visits from legal counsel, programming and mental health services, and access to law library materials and telephone calls. They are permitted to have certain items of personal property in their cell, including periodicals, photographs, toiletries, prescription medication and playing cards. They may also purchase items from the prison commissary, including stamps, writing materials, and non-cookable food items. Incarcerated individuals in segregated confinement are permitted one to two hours of outdoor exercise daily and are examined and treated by medical and mental health professionals. They have access to personal hygiene services, including four showers and shaves per week, hot water, haircuts, clean laundry and cleaning materials.

115.    Incarcerated individuals in segregated confinement are also offered core educational and rehabilitative programming, including academic outreach/ cell study, a program that provides in-cell instruction, tutoring services, and the necessary materials for incarcerated individuals ranging from literacy through college studies. Another program made available to incarcerated individuals in segregated confinement is Alcohol and Substance Abuse Treatment (ASAT) and the Special Housing Unit Pre-Treatment Workbook Program, an educational intervention for repeat, long-term alcohol and/or drug users who continue to struggle with substance abuse while incarcerated.

116.    Defendant DOCCS provides incarcerated individuals in segregated confinement more privileges and amenities than ever before, often on a more individualized basis, and in stark contrast to popular culture's portrayal of a small, dark room and no human contact for days, weeks or months on end.

24

**The State's laws, policies, practices and customs surrounding the use of segregated confinement of violent incarcerated individuals directly impacts Plaintiffs' workplace safety**

117.   Plaintiff NYSCOPBA is the certified collective bargaining representative for approximately 18,000 Correction Officers and Correction Sergeants who work in Defendant DOCCS' fifty (50) correctional facilities in New York State.

118.   In those titles, Correction Officers and Correction Sergeants are uniformed peace officers responsible for the care, custody, and control of approximately 34,000 incarcerated individuals in New York State.

119.   Incarcerated individuals have been convicted of and are serving sentences for one or more crimes, including extremely violent crimes.  They are the individuals that society wishes to separate from itself for their own protection.

120.   Correction Officers and Correction Sergeants are responsible for protecting incarcerated individuals who are attempting to serve out their prison sentence peacefully— protecting them from self-harm and protecting them from other, violent incarcerated individuals. Correction Officers and Correction Sergeants are also charged with protecting themselves, their fellow employees, and the public at large from hostility by violent, incarcerated individuals.

121.   As such, changes to Defendants' laws, rules, regulations, policies, procedures and/or customs surrounding the manner that incarcerated individuals are housed within Defendants' facilities has a direct impact on the safety of Correction Officers and Correction Sergeants who are charged with their care, custody and control.

122.   The Individual Plaintiffs in this action are employed by Defendant DOCCS and have experienced a surge of violence in their respective prisons that has coincided with Defendants' leniency towards incarcerated individuals who commit violent acts and disciplinary infractions, and Defendants' changing policies and procedures surrounding the use of segregated

confinement, that limit Plaintiffs' ability to remove violent incarcerated individuals from the rule-abiding prison population.

123.    These changes, in Plaintiffs' experience, have increased workplace danger beyond what is custom in their profession.  These changes have resulted in serious, permanent injuries to the Individual Plaintiffs and/or their fellow employees.

124.    The Individual Plaintiffs below detail assaults on staff and incarcerated individuals under the care of Defendants.  These assaults are known and have been investigated and recorded by Defendant DOCCS, and included in Defendant DOCCS' annual reports on assaults against incarcerated individuals and staff.  *See* **Exh. D, E.**

### Plaintiff Correction Officer Alexander Voitsekhovski

125.    Alexander Voitsekhovski has been employed as a Correction Officer by a Defendant DOCCS since September 2016.

126.    Officer Voitsekhovski has been the victim of multiple assaults from the same violent criminal who was only twenty-one (21) years of age at the time and who not only threw urine and feces into his face, but physically assaulted him in such a way that it caused lasting injuries and damage that he experiences to this day.

127.    On February 29, 2020, Officer Voitsekhovski worked as a Correction Officer on F-3 Block at Coxsackie Correctional Facility, which is a maximum security correctional facility for males.  F-3 Block at Coxsackie Correctional Facility is a keeplock unit, which houses incarcerated individuals who are being confined to their cells due to serving sentences that have resulted from disciplinary infractions.

128.    Incarcerated individual C.T. (DIN **-*-1037) was housed on F-3 Block at Coxsackie Correctional Facility.

26

129.    At all times relevant herein, C.T. was serving a prison sentence for attempted criminal possession of a weapon in the second degree.

130.    Upon information and belief, C.T. has been serving such prison sentence since April 2019.

131.    At all times relevant herein, C.T. was twenty-one (21) years old.

132.    On February 29, 2020, Officer Voitsekhovski escorted C.T. to and from the computer tablet kiosk.  Incarcerated individuals on F-3 Block at Coxsackie Correctional Facility are entitled to receive, at no charge, a computer tablet on which they can pay to download music, movies, books, articles, learning programs, and exchange emails with approved friends and family. Upon information and belief, on February 29, 2020, each of the approximately forty-two (42) incarcerated individuals housed on F-3 Block were entitled to fifteen (15) minutes of time at the computer tablet kiosk in order to download new content to their computer tablets.

133.    Thereafter, Officer Voitsekhovski conducted a required security round of F-3 Block.  A required security round involves an officer walking the entire length of the housing unit and visibly observing the incarcerated individuals and the contents of each cell to determine that all is secure and in order, that everyone is safe and accounted for, and to see if any incarcerated individuals are in need of medical or other attention.

134.    During his required security round, Officer Voitsekhovski passed the cell of C.T. Upon briefly observing C.T. and his cell, Officer Voitsekhovski noticed that C.T. was engaging in some kind of obscure activity near his toilet.  Officer Voitsekhovski determined that C.T. was attempting to use the toilet for a legitimate personal purpose and directed him to turn around.  At that time, C.T. scooped the contents of the toilet into a cup and threw the contents through the cell

door bars and into the face and chest of Officer Voitsekhovski. It was later determined that the contents of C.T.'s cup contained feces, urine, and toilet water.

135.   C.T. was removed from his cell in F-3 Block and re-located to segregated confinement. At the time of the incident, the throwing of feces, urine, and toilet water at a staff member constituted a disciplinary infraction pursuant to Defendant DOCCS directives, rules, and regulations.

136.   At the time of the incident, the throwing of feces, urine, and toilet water at a staff member constituted the crime of Aggravated Harassment of an Employee by an Incarcerated individual, which is a Class E Felony pursuant to New York Penal Law 240.32.

137.   At the time of the incident, C.T. was approximately twenty-one (21) years and two (2) months old.

138.   Shortly after C.T. assaulted Officer Voitsekhovski on F-3 Block with urine and fecal matter, Officer Voitsekhovski engaged in the bidding procedure to which is he entitled pursuant to the Collective Bargaining Agreement between NYSCOPBA and the State of New York and took a post at Reception, on E-1 Block, at Coxsackie Correctional Facility. Therefore, Officer Voitsekhovski relinquished his bid on F-3 Block.

139.   Upon information and belief, the Reception Unit is for incarcerated individuals who have either just arrived at Coxsackie Correctional Facility and are awaiting permanent placement on a housing unit, or for incarcerated individuals who are about to depart Coxsackie Correctional Facility.

140.   Upon information and belief, the Reception Unit is not outfitted to meet the needs of higher-level security risk incarcerated individuals such as those confined to segregated confinement for disciplinary misconduct.

28

141.   Upon information and belief, C.T. was relocated from segregated confinement to the Reception Unit after the assault on Officer Voitsekhovski.

142.   Upon information and belief, then-NYSCOPBA Chief Sector Steward Kevin Donnelly sent an email communication to a Correction Captain employed by Defendant DOCCS at Coxsackie Correctional Facility warning about C.T. and his propensity for violence.

143.   Upon information and belief, this warning was not acted upon.

144.   On June 29, 2020, Officer Voitsekhovski was working the Reception Unit E-1 Block.

145.   On June 29, 2020, C.T. was housed on the Reception Unit E-1 Block despite no plans by Defendant DOCCS to imminently transfer him out of the facility.

146.   Upon information and belief,  incarcerated individuals on the Reception Unit are entitled to showers and are required to be placed in mechanical restraints (handcuffs) and then to be individually escorted to an individual shower stall.  The incarcerated individual is then locked into the shower stall in order to safely shower by himself.

147.   Upon information and belief, unlike in segregated confinement units (special housing or separate keeplock units), the individual shower stalls on the Reception Unit are not fitted with extra security measures for incarcerated individuals who are a higher level security risk. The individual shower stall door does not have a separate hatch that would otherwise allow an officer to lock an incarcerated individual into the shower, order the incarcerated individual to then place his hands through the hatch, and then remove the incarcerated individual's mechanical restraints through the locked door.

148. Upon information and belief, instead, the Reception Unit showers require the officer to stand directly behind the incarcerated individual, with the individual shower door open and no separation between the officer and the incarcerated individual.

149. On June 29, 2020, four months after throwing urine, feces and toilet water on Officer Voitsekhovski, C.T. was entitled to a shower while being housed on the Reception Unit.

150. Officer Voitsekhovski was working the Reception Unit and was charged with escorting C.T. to the showers.

151. Officer Voitsekhovski placed the mechanical restraints on C.T. and escorted him to his individual shower stall. Officer Voitsekhovski placed C.T. in his individual shower stall and, since he was unable to secure the incarcerated individual due to the lack of security hatch in the shower stall door, he gave C.T. a direct order to comply with his removal of the mechanical restraints. No door or other security feature was available for Officer Voitsekhovski to securely remove C.T.'s mechanical restraints.

152. Immediately upon Officer Voitsekhovski's removal of C.T.'s mechanical restraints, and prior to Officer Voitsekhovski's ability to step back and secure the shower door, C.T. quickly turned around to face Officer Voitsekhovski and began assaulting him with closed fist punches to his face.

153. Officer Voitsekhovski attempted to control C.T.'s punches by placing him in a bear hug-type body hold, but C.T. pushed forwards, causing Officer Voitsekhovski to fall backwards with the entire weight of C.T. on top of him. Officer Voitsekhovski landed on his back and struck the back of his head on the tile shower floor.

154. C.T. continued to assault Officer Voitsekhovski. Officer Voitsekhovski was unable to call for assistance because his radio became dislodged during the initial assault. Officer

Voitsekhovski was able to force C.T. off him and C.T. ran back to his cell and locked himself back in.

155.    C.T. was approximately twenty-one (21) years and six (6) months old at the time of his second assault of Officer Voitsekhovski.

156.    Officer Voitsekhovski suffered serious injuries as a result of the assault by C.T. and was immediately transported to Albany Medical Center.

157.    Officer Voitsekhovski spent approximately four (4) to five (5) days in a hospital Intensive Care Unit, having suffered injuries that include: a fractured skull, a traumatic brain injury in the form of multiple brain bleeds, a fractured sternum, a broken rib, impingement syndrome in his right shoulder (bursitis), and a right toe injury.

158.    Officer Voitsekhovski has not been physically able to return to work due to the resulting effects of the assault by C.T.  As of the date of this filing, Officer Voitsekhovski has suffered, and continues to suffer, from dizziness, light-headedness, prolonged headaches, loss of smell and taste, inability to sleep, pinched nerves, and scarring on his brain.

159.    Upon information and belief, Officer Voitsekhovski's injuries are the result of Defendant DOCCS' increasingly and excessively lenient response to serious and dangerous incarcerated individual misconduct.  C.T. was twenty-one (21) years old at the time of both assaults, engaged in felonious activity during both assaults, and was treated by the Department with minimal security during the intervening time between the assaults by failing to secure him in segregated confinement.  Instead, Defendant DOCCS placed C.T. in a less-secure Reception Unit. Defendant DOCCS created a dangerous environment by implementing a lenient and ineffective incarcerated individual misconduct policy that allowed an assaultive incarcerated individual to be

removed from segregated confinement and placed on a lower security level unit mere months after assaulting an officer that he was able to seriously assault again.

160.    Upon information and belief, if the provisions of HALT had been in effect at the time, C.T. would have received a three-day penalty in segregated confinement for the unhygienic act of throwing feces and urine in the face of Officer Voitsekhovski and C.T. would have received a fifteen-day penalty in segregated confinement for his vicious assault on Officer Voitsekhovski, causing, in part, a traumatic brain injury.

**Plaintiff Correction Officer Chloe Hayes**

161.    Chloe Hayes has been employed as a Correction Officer for Defendant DOCCS since September 2017.

162.    On June 5, 2020, Officer Hayes worked as a dorm officer on J-2 dormitory housing unit at Greene Correctional Facility, a medium security level facility for males.   Officer Hayes was the only Correction Officer working on the dormitory where approximately forty (40) male incarcerated individuals were housed.

163.    Incarcerated individual T.B. (DIN **-*-4576) was housed on J-2 housing unit at Greene Correctional Facility.

164.    Upon information and belief, T.B. was convicted of attempted murder after walking into a Bronx hospital emergency room and stabbing a complete stranger repeatedly in the chest and arms with a knife.   T.B. was assigned as an incarcerated individual porter on J-2, meaning he was assigned to clean the housing unit and other areas of the prison in exchange for privileges and wages.

165.    Upon information and belief, on June 5, 2020, T.B. asked Officer Hayes if he could retrieve the caustics box, i.e., cleaning supplies, off the dormitory porch.  Officer Hayes authorized

T.B. to retrieve the caustics box off the porch, and he placed it in front of the officer supply closet. Incarcerated individuals are not permitted to enter the supply closet unless authorized by an officer. Officer Hayes unlocked the officer supply closet, picked up the caustics box and entered the closet to place the box in the closet.

166.    Upon information and belief, unbeknownst to Officer Hayes, T.B. entered the supply closet behind her without authorization, closed the door and punched Officer Hayes in the face multiple times.

167.    Upon information and belief, Officer Hayes, in shock, yelled at T.B. and asked him what he was doing. Upon information and belief, T.B. then held Officer Hayes's arms against her sides and threw her up against a wall in the supply closet, in effect striking her back and head on the supply closet wall; he ripped her shirt open, removed the body-worn camera off her chest and threw Officer Hayes's body-worn camera out of the supply closet; still immobilizing her arms, he kneed Officer Hayes in the thigh area repeatedly, to spread her legs apart while bringing her to the ground.

168.    Upon information and belief, T.B. then removed the radio off Officer Hayes's uniform and threw it out of the supply closet. Officer Hayes' radio was her primary, if not sole, means of calling for help from security staff since she was the only Correction Officer on the dorm.

169.    Upon information and belief, T.B. continued to knee Officer Hayes in the thigh area in an attempt to sexually assault her while she attempted to escape his grasp.

170.    At that time, other incarcerated individuals on the dorm heard the disturbance and came to Officer Hayes's assistance, then called for help.

171.    Officer Hayes was transported to Albany Medical Center with facial lacerations and lacerations and bruising on her legs.

172.     Upon information and belief, Officer Hayes took a course of anti-viral medication for eight weeks and was intermittently tested for blood borne diseases for several months after this incident.  She suffered severe bruising and nerve damage to her back and lower extremities, requiring physical rehabilitation for two months following the assault.  She has been diagnosed with post-traumatic stress disorder, anxiety, and depression for which she still seeks treatment to this day.  Officer Hayes has only recently been able to return to work at Greene Correctional Facility since her assault and attempted sexual assault by T.B.

173.     Upon information and belief, T.B. was sentenced to time in segregated confinement, but did not serve his complete sentence due to a medical condition.

174.     Upon information and belief, Officer Hayes's assault is the result of Defendant DOCCS' increasingly and excessively lenient response to serious and dangerous incarcerated individual misconduct.  T.B., despite his crime of conviction, was in a position as a housing unit porter that allowed him access to staff.

175.     Upon information and belief, despite committing a felonious act while incarcerated, he had his segregated confinement time cut, permitting him to return to a congregate setting, with access to staff and other incarcerated individuals.

176.     Upon information and belief, had the provisions of HALT been in effect at the time, T.B. would have received a fifteen-day penalty in segregated confinement for his violent assault on Officer Hayes.

**Plaintiff Correction Officer Sarah Tompkins**

177.    Sarah Tompkins has been employed as a Correction Officer for Defendant DOCCS since September 2006.

178.    On September 17, 2020, Officer Tompkins worked a post in the facility's A and B Yard at Green Haven Correctional Facility, a maximum-security level facility for males.   On that day, Officer Tompkins was outside of the front door of A-Block housing unit waiting to run chow (one of three daily meals) as part of her job.

179.    Incarcerated individual E.W. (DIN **-*-2523) was serving a prison sentence at Green Haven Correctional Facility for attempted robbery in the third degree and two counts of promoting prison contraband.

180.    Upon information and belief, at the same time, E.W. was involved in a multiple-incarcerated individual fight in a different location inside of Green Haven Correctional Facility. Two Correction Officers escorted E.W. to the facility's infirmary to receive medical attention following the fight, they walked past the front door of A-Block housing unit where Officer Tompkins was working.   E.W. and Officer Tompkins exchanged no words.

181.    Upon information and belief, as E.W. passed Officer Tompkins, he made eye contact with her, and then suddenly and without warning, spit a mouth full of blood and saliva all over Officer Tompkins's face and chest.

182.    Upon information and belief, Officer Tompkins had to take a course of anti-viral medication for thirty days and be intermittently tested for blood borne diseases for several months after this incident.

183.    E.W. served time in segregated confinement because of his assault on Officer Tompkins.

184.    Upon information and belief, Officer Tompkins' assault serves as an example of assaultive conduct that will be capable of repetition on a regular and consistent basis under Defendants' current and, as set forth further herein, future policies, that return incarcerated individuals who commit violent acts that do not result in serious injury to congregate settings within three days.

185.    Upon information and belief, had the provisions of HALT been in effect at the time, E.W. would have received a three-day penalty in segregated confinement for such actions against Officer Thompkins.

### Plaintiff Correction Officer Erik Mesunas

186.    Erik Mesunas has been employed as a correction officer by a Defendant DOCCS since March 1988.

187.    On April 12, 2020, Officer Mesunas worked as a correction officer in the North Recreation Yard at Clinton Correctional Facility.  This is known as Ground Post 23.  The North Recreation Yard is an outdoor open-air space for the purpose of allowing incarcerated individuals to engage in varying forms of recreation.

188.    On April 12, 2020, approximately 212 incarcerated individuals were present in the North Recreation Yard.

189.    As the officer working Ground Post 23, Officer Mesunas is charged with, in pertinent part, monitoring incarcerated individual use of the incarcerated individual telephones so as to ensure that: incarcerated individuals are waiting in line for their turn to use the phones; gangs are not exercising influence over who may and may not use the phones during recreation; and each incarcerated individual on the phone is not going beyond his fifteen-minute allotted call time.

190.    Upon information and belief, on April 12, 2020, incarcerated individual A.C. (DIN *-*-2736) was in the North Recreation Yard while Officer Mesunas was monitoring the phones as part of Ground Post 23.

191.    At all times relevant herein, A.C. was serving a prison sentence for two (2) counts of robbery and two (2) counts of attempted robbery.

192.    Upon information and belief, A.C. attempted to skip those incarcerated individuals who were already in line for the phones.

193.    Upon information and belief, Officer Mesunas directed A.C. to stop, which prompted A.C. to become argumentative and state to Officer Mesunas words to the effect of: "You're going to have to force me out of the yard."

194.    A.C. then walked away briefly before quickly returning to Officer Mesunas and striking Officer Mesunas in the face with a closed fist punch without provocation.

195.    Upon information and belief, the force from A.C.'s strike to Officer Mesunas's face rendered Officer Mesunas unconscious.

196.    After the initial strike, A.C. descended upon Officer Mesunas and struck him several times in the jaw and face with multiple closed fist punches.

197.    In response to this assault on Officer Mesunas, the facility called for an immediate response to the North Recreation Yard.

198.    Upon information and belief, A.C. fled the immediate area and attempted to conceal himself within the crowd of incarcerated individuals in the surrounding area to avoid detection.

199.    Responding staff immediately assessed Officer Mesunas, placed him on a backboard, and escorted Officer Mesunas to the facility infirmary where it was determined that his injuries required medical attention at Champlain Valley Physicians Hospital ("CVPH") in

Plattsburgh, New York.   Officer Mesunas was then transported to CVPH by emergency ambulance.

200.    Upon arrival and examination by CVPH medical staff, it was determined that Officer Mesunas suffered a broken jaw on both sides of his jaw and a concussion from the assault by A.C.   Upon information and belief, the injuries suffered by Officer Mesunas as a result of the assault by A.C. were so severe as to require surgical intervention.

201.    On April 27, 2021, Officer Mesunas underwent necessary surgery to repair his broken jaw.  The surgical team placed two (2) titanium plates in his jaw and then wired his jaw shut to allow the jaw to heal.  This surgery requires Officer Mesunas to be on a liquid-only diet until his jaw has healed.  Upon information and belief, Officer Mesunas also suffered nerve damage in his face and the loss of a tooth as a result of the attack by A.C.  He has not returned to work since the assault.

202.    Upon information and belief, Officer Mesunas's assault serves as an example of assaultive conduct that under Defendants' current and future policies will be treated with leniency, not permitting staff to remove the incarcerated individual from the general population of incarcerated individuals until a disciplinary proceeding is completed, and if found guilty, serving a maximum of fifteen days in segregated confinement.

203.    Upon information and belief, had the provisions of HALT been implemented at the time, A.C. would have served a fifteen-day penalty in segregated confinement for his vicious assault on Officer Mesunas.

**Plaintiff Correction Sergeant Thomas Hannah**

204.     Thomas Hannah has been employed by Defendant DOCCS since June 1985 as a Correction Officer and was promoted as Correction Sergeant in September 2001.

205.     Since his initial employment with Defendant DOCCS, Sgt. Hannah has worked at Attica Correctional Facility (maximum security correctional facility with SHU), Five Points Correctional Facility (maximum security correctional facility with SHU), and Arthur Kill Correctional Facility (then-medium security correctional facility with SHU).

206.     Sgt. Hannah has witnessed firsthand the daily harassment and abuse of staff and rule-abiding incarcerated individuals by those violent criminals who are intent on defying the order of the facility.

207.     Sgt. Hannah has worked at Southport Correctional facility since approximately October 2001, which is a "supermax" ultra-maximum-security prison for males.

208.     Southport Correctional Facility serves as a Special Housing Unit facility for incarcerated individuals serving disciplinary dispositions, with a cadre of non-disciplinary status incarcerated individuals who are assigned to the facility to provide necessary services.

209.     Sgt. Hannah oversees the Step-Down Unit at Southport Correctional Facility.

210.     The Step-Down Unit at Southport Correctional Facility is a single cell SHU-alternative program where the goal is to improve behavior and reduce future disciplinary infractions by offering behavioral modification programming to long-term SHU incarcerated individuals with a violent behavioral history and who have the capacity to benefit from this programming, with the aim of returning those incarcerated individuals who successfully complete the program back to the general incarcerated individual population.

211.    The Step-Down Unit at Southport Correctional Facility ushers incarcerated individuals serving disciplinary dispositions through a Phase 1, 2 and 3 system, with Phase 1 being the most restrictive environment and Phase 3 being the least restrictive environment.

212.    Upon information and belief, Phase 1 incarcerated individuals spend two hours per day in a single-man recreation area, Phase 2 incarcerated individuals spend two hours per day in a four-man recreation area, and Phase 3 incarcerated individuals spend two hours per day in a congregate recreation setting with the general incarcerated individual population.

213.    The Step-Down Unit programming provides for incarcerated individuals to participate in classroom-type learning settings, while being secured in "restart chairs" for their own safety and the safety of incarcerated individuals and staff.

214.    Restart chairs allow an incarcerated individual to be secured to a chair and desk by their feet, but with hands free so as to complete programming work sheets, etc.

215.    Despite the programmatic setting and the security of the restart chair, incarcerated individuals still engage in violence and disruption against incarcerated individuals and staff.

216.    Upon information and belief, on November 24, 2020, incarcerated individual E.W. (DIN **-*-3213) was in a classroom for programming purposes at Southport Correctional Facility and was secured to a restart chair while speaking with Sgt. Hannah.

217.    E.W. is serving a prison sentence for attempted murder in the second degree and assault in the first degree.

218.    Without provocation or any warning whatsoever, the incarcerated individual stood up from his restart chair, lunged at Sgt. Hannah, and slapped him across the face.

219.     Another security staff member was standing behind the incarcerated individual at the time and pulled E.W. back into his chair, which prompted E.W. to stop resisting and become compliant.

220.     No warning or reason was given by E.W. for striking Sgt. Hannah in such a manner in front of other incarcerated individuals and staff while in the classroom completing his Step-Down Unit programming.

221.     Upon information and belief, had the provisions of HALT been in effect at the time, E.W. would have received a penalty of three-days in segregated confinement for his actions.

222.     Upon information and belief, on November 25, 2020, incarcerated individual W.A (DIN **-*-2514) was in a classroom with other incarcerated individuals who were all engaging in Step-Down Unit programming.

223.     W.A. was serving a prison sentence for burglary in the first degree and has since been released from prison.

224.     W.A. was secured to a restart chair and was asked to be removed from the classroom to go back to his cell.

225.     A security staff member obliged W.A., placed him in the required mechanical restraints, and began to escort him out of the classroom.

226.     W.A. was escorted past incarcerated individual R.U. (DIN **-*-1456), who is serving a prison sentence for burglary in the second degree.

227.     R.U. was secured to a restart chair in the classroom completing his programming.

228.     Upon information and belief, when escorted past R.U., W.A. kicked at and struck R.U. in the upper torso several times.

229.    Escorting staff used force on W.A. in order to protect R.U. and forced W.A. to the ground on his back.

230.    Upon information and belief, W.A. began to kick a staff member in the abdomen several times and indiscriminately kicked at other responding staff attempting to control him with body holds.

231.    During the assault on R.U. and the subsequent use of force by staff, Sgt. Hannah responded to the scene and overtook control of the incident.

232.    Despite this unprovoked assault on a fellow incarcerated individual and staff, Defendant DOCCS determined that W.A. would be allowed to remain in the Step-Down Unit program moving forward.

233.    Upon information and belief, had the provisions of HALT been in effect at the time, W.A. would have served a three-day sanction in segregated confinement for his assault on R.U.

234.    Sgt. Hannah has witnessed first-hand the incarcerated individual-on-incarcerated individual violence that results from placing incarcerated individuals who are in segregated confinement for violent acts back into a congregate setting after a short period of time.

235.    Upon information and belief, many of the incarcerated individuals in segregated confinement are gang-affiliated, and use the looser restrictions of the Step-Down Units as an opportunity to recruit gang members and/or commit violent assaults in the name of gang retribution.

236.    Upon information and belief, the four-man recreation areas of the Step-Down unit facilitate gang-affiliated incarcerated individuals targeting and assaulting rival gang members and others, in Sgt. Hannah's experience, and has resulted in serious injury to multiple incarcerated individuals at Southport Correctional Facility.

### Plaintiff Correction Sergeant Kerri Montgomery

237.    Kerri Montgomery has been employed by Defendant DOCCS as a Correction Officer since May 2006 and she was promoted to Correction Sergeant in May 2019. Sgt. Montgomery has witnessed, responded to and investigated assaults against staff as a Correction Sergeant at Coxsackie Correctional Facility, a maximum-security prison for males. Sgt. Montgomery also previously worked as a Correction Sergeant in the Attica Correctional Facility SHU, Mid-State Correctional Facility SHU and Step-Down Programs, as well as a bid officer in the Coxsackie Correctional Facility SHU.

238.    Sgt. Montgomery has first-hand knowledge of the assaults that violent incarcerated individuals commit against staff and other incarcerated individuals on a regular basis, and how sanctions for those assaults, specifically time spent in segregated confinement, have decreased significantly through Defendant DOCCS' limiting the number of days incarcerated individuals can be sentenced to segregated confinement, and the institution of time cuts for incarcerated individuals in segregated confinement.

239.    On October 28, 2020, Sgt. Montgomery supervised two Correction Officers (hereinafter "Officer 1" and "Officer 2") in their escort of incarcerated individual B.G. (DIN **-*-0968) from the Coxsackie Correctional Facility clinic to housing unit F-3, a keeplock unit.

240.    Upon information and belief, B.G. was convicted of criminal possession of a weapon after a 2019 incident wherein he allegedly attempted to shoot another individual with a loaded pistol, recklessly causing injury to a three-year-old child by the intentional discharge of the pistol.

241.    At all times relevant herein, B.G. was nineteen (19) years old.

242.     Upon information and belief, prior to the escort on October 28, 2020, B.G. was designated to a keeplock housing unit for a disciplinary offense, and as such, the escort from the facility clinic was performed while B.G. was secured by mechanical restraints.

243.     Upon information and belief, upon entering the F-Block stairwell, B.G. became violent and intentionally swung his head backwards, head-butting Officer 1 in the face and head. Officer 1, Officer 2, and Sgt. Montgomery used body holds to bring B.G., who continued to fight the staff, to the ground.

244.     Upon information and belief, Officer 1, who was head-butted sustained injury to his face, teeth and shoulder, was taken to an outside hospital.

245.     Upon information and belief, B.G. was taken back to the facility clinic with no injuries, and then admitted to a special housing unit.

246.     Upon information and belief, B.G. was nineteen (19) years old at the time of his assault on the Correction Officer.

247.     Sgt. Montgomery has witnessed, responded to, supervised and investigated dozens of incidents over the last two years wherein the most violent incarcerated individuals in the facility are able to commit, and do regularly commit, unprovoked assaults on staff and other incarcerated individuals.

248.     Upon information and belief, had the provisions of HALT been implemented at the time, B.G. would have received a three-day penalty in segregated confinement for his actions.

249.     Upon information and belief, on June 7, 2020, incarcerated individual M.A. (DIN **-*-2222), a known member of the Bloods gang, was walking down the C-3 housing block, a general population housing block in an area supervised by Sgt. Montgomery, making his way toward the yard for recreation.

44

250.     Upon information and belief, M.A. was convicted of attempted murder, attempted assault and criminal possession of a weapon after a 2010 incident where he led police officers on a foot chase in Jamaica, Queens, and fired a shot at the officers during the encounter.

251.     Upon information and belief, on June 7, 2020, as M.A. approached the door to exit the housing block, he, unprovoked and without warning, punched a correction officer (hereinafter "Officer 3") working on the housing block in the face and grabbed Officer 3 around his body.

252.     Upon information and belief, Officer 3 was unable to activate his two-way radio to call for help during the assault, and another officer on the housing block below radioed Sgt. Montgomery.  Multiple Correction Officers and Sgt. Montgomery responded to the area and pulled M.A. off the officer, who was injured as a result of the assault.

253.     M.A. was admitted to a Special Housing Unit as a result of the June 7, 2020, assault.

254.     Upon information and belief, had the provisions of HALT been implemented at the time, M.A. would have been assessed a fifteen-day penalty in segregated confinement.

255.     Sgt. Montgomery has experienced first-hand how crucial segregated confinement, particularly special housing units, can be in preventing senseless violent assaults on staff.  The degradation of its use by Defendants has had a direct and negative impact on security supervisors like Sgt. Montgomery.

256.     The enactment of HALT, as set forth further herein, means that assaults like those that Sgt. Montgomery became involved in on June 7, 2020, will likely only result in segregated confinement for three days, after which time the incarcerated individual will be placed back into a congregate setting.  Assaults like the September 28, 2020, assault will result in no time being served in segregated confinement because the nineteen year old incarcerated individual with a history of repeated violence falls into a 'special population'.

**The enactment and implementation of HALT will dramatically increase violence and danger to the security staff and incarcerated individuals in DOCCS prisonsvoit**

257.   On March 18, 2021, the New York State Legislature passed the Humane Alternatives to Long-Term Solitary Confinement Act ("HALT" Act) (S. 2836), which Defendant Governor Cuomo signed into law on March 31, 2021.

258.   Upon information and belief, HALT provides for the most lenient and least restrictive means ever implemented by Defendant DOCCS for addressing discipline and segregated confinement of incarcerated individuals within its facilities.

259.   In pertinent part, HALT limits segregated confinement for all incarcerated individuals to fifteen (15) consecutive days; limits use of segregated confinement to no more than twenty (20) days in any sixty-day period (with some very limited exceptions); limits the penalty for most offenses to a maximum of three (3) days in segregated confinement, expands the definition of segregated confinement to include any kind of cell confinement for more than seventeen (17) hours per day; eliminates the use of segregated confinement for incarcerated individuals based on age; and prohibits placement in segregated confinement prior to a disciplinary hearing.

260.   HALT also implements alternative rehabilitative measures, including the creation of Residential Rehabilitation Units (RRU), where incarcerated individuals will be afforded additional out-of-cell time and rehabilitative programming in congregate settlings after the 15-day limit has been reached.

261.   HALT will take effect on April 1, 2022.  Annexed hereto as **Exh. G** is a true and accurate copy of the HALT Act, plus pertinent Chapter Amendment language (Part NNN of Chapter 59 of the Laws of 2021).

262.    The provisions contained in HALT will make State prisons operated by Defendant DOCCS even more dangerous to Correction Officers, Correction Sergeants, and rule-abiding incarcerated individuals as a direct result of the unprecedented, increased leniency towards those incarcerated individuals who commit violent offenses in prison, which is now required by law.

263.    When HALT is implemented, incarcerated individuals twenty-one (21) years of age or younger and incarcerated individuals fifty-five (55) years of age or older will be deemed a "special population" that cannot, under any circumstances, ever be placed in any form of segregated confinement, regardless of the severity or the results of the misconduct. Incarcerated individuals who are twenty-one (21) years of age or younger and incarcerated individuals who are fifty-five (55) years of age or older are capable of, and have routinely engaged in, extreme acts of violence and disruption within correctional facilities operated by Defendant DOCCS. Such misconduct and acts of violence have resulted in serious injuries and hospitalizations to staff members.

264.    As discussed above, the injuries suffered by Plaintiff Voitsekhovski were as a result of two assaults by the same incarcerated individual while the incarcerated individual was twenty-one years old.

265.    As discussed above, B.G.'s assault on staff in Plaintiff Montgomery's area on September 28, 2020, wherein he head-butted the officer unprovoked and without warning, occurred when B.G. was nineteen years old.

266.    Incarcerated individuals in this "special population" will no longer be deterred from acts of violence and misconduct by corrective and punitive placement in segregated confinement because segregated confinement will no longer be an available tool for corrections staff to remove such incarcerated individual from all other incarcerated individuals and staff. Preventing

Correction Officers and Corrections Sergeants from utilizing segregated confinement for this population of incarcerated individuals creates an unreasonable increase in danger to employees and incarcerated individuals in the general incarcerated individual population.

267.    HALT also places a maximum fifteen (15) day sentence in segregated confinement for all other incarcerated individuals.

268.    Despite the maximum sentence, a fifteen-day sentence in segregated confinement is reserved only and exclusively for the most heinous and disruptive of offenses by incarcerated individuals: causing or attempting to cause serious physical injury or death; force or threat of force to engage in a sexual act; extortion of another for property or money; coercion of another to violate any rules; procuring a weapon or other dangerous contraband; attempted or actual riot/insurrection; and attempted or actual escape.

269.    HALT mandates that many other disruptive and violent offenses, can, at most, amount to a maximum of three (3) days in segregated confinement.

270.    Among the list of offenses that are violent and disruptive, but still only amount to three (3) days in segregated confinement include: assault that does not result in serious physical injury; propelling of fecal or other unhygienic matter on to staff or other incarcerated individuals; attempted or actual bribery; disobeying orders from staff; lying or providing an incomplete, misleading, and/or false statement or information; being under the influence of narcotics, controlled substances, or alcohol.

271.    Restricting the use of segregated confinement for only the most violent offenses, and the type of acts which will result in segregated confinement, neither deters violent behavior nor does it protect staff and incarcerated individuals from those violent criminals who have shown a propensity for violent behavior towards others.   Rather, it creates an environment for the most

48

violent incarcerated individuals to commit violent and heinous acts in a congregate setting, which increases workplace danger.

272.   HALT also requires that no incarcerated individual, except under very limited circumstances when an incarcerated individual commits serious misconduct and cannot be immediately placed into a Residential Rehabilitation Unit, can spend more than twenty (20) days in segregated confinement during any sixty (60) day period.  After an incarcerated individual has reached the maximum allowable sentence in segregated confinement, HALT then requires that the offending incarcerated individual be transferred to a Residential Rehabilitation Unit ("RRU"). Pursuant to HALT, an RRU is an alternative to segregated confinement to which all incarcerated individuals in segregated confinement are funneled for the remainder of their disciplinary sentences.

273.   Therefore, incarcerated individuals who have already been placed in segregated confinement for twenty (20) days in a sixty-day period can commit violent offenses and will not be re-placed in segregated confinement.

274.   Pursuant to HALT, when an incarcerated individual reaches the expiration of the maximum amount of time that he or she can spend in segregated confinement (either three or fifteen days), the incarcerated individual is then diverted to an RRU.

275.   Once placed in the RRU, the incarcerated individual will engage in rehabilitative programming.

276.   The incarcerated individual will then be returned to general population at the expiration of the disciplinary sanction (length of time determined by the infraction(s)) or the completion of the rehabilitative programming, whichever is sooner.

277. Upon information and belief, the new segregated confinement/RRU system will allow some incarcerated individuals placed in the RRU for rehabilitative programming to return to general population prior to completion of the programming because their sanctions expired first.

278. Upon information and belief, the point of the rehabilitative programming is fundamentally frustrated by its lack of completion and offending incarcerated individuals are returned to general population to re-offend.

279. Upon information and belief, the cause of the lack of programming completion is due to time cuts instituted by HALT, which drastically reduce the length of disciplinary sanctions that may be imposed for any particular offense.

280. The RRU may provide for therapeutic and rehabilitative programming and environment, but it does so at the cost of safety and security to staff and other incarcerated individuals because HALT does not provide for means to ensure their safety.

281. Incarcerated individuals placed in the RRU after segregated confinement are provided a mandatory six (6) hours of daily out-of-cell time in the most congregate setting allowable. The six (6) hours out-of-cell time includes programming, services, treatment, and meals. Incarcerated individuals placed in RRU are also entitled to an additional hour of out-of-cell time in the form of recreation. In total, an incarcerated individual who is placed in the RRU after the expiration of his segregated confinement sentence is entitled to seven (7) hours out-of-cell in congregate settings every day.

282. Upon information and belief, the "most congregate setting" is a cornerstone of HALT, which provides that incarcerated individuals who have been found to have committed violent or other disruptive acts be allowed to engage in programming and social time with other similarly situated incarcerated individuals who have also committed violent or disruptive acts

50

without restraints of any kind and without restriction to their cells. In many instances, these incarcerated individuals will be placed in a congregate setting with the very same incarcerated individuals with whom they engaged in violence or other disruption.

283. Implementation of RRUs is wholly insufficient to replace segregated confinement because it places the most violent incarcerated individuals back in congregate settings.

284. Upon information and belief, incarcerated individuals who are involved in a physical altercation resulting in segregated confinement are thereafter placed in the RRU together, in the most congregate setting allowed.

285. Upon information and belief, Defendant DOCCS will not provide increased security staffing in response to managing the most congregate settings possible for incarcerated individuals coming out of segregated confinement after a maximum of three (3) or fifteen (15) days.

286. Furthermore, HALT prevents incarcerated individuals from being held in segregated confinement upon engaging in misconduct until after they have had their disciplinary hearing to determine whether violation of a law, rule or regulation occurred.

287. Therefore, incarcerated individuals who have been found to engage in misconduct remain in general population immediately after the misconduct, no matter how serious.

288. The incarcerated individuals who assaulted Officer Hayes, Officer Tompkins and Officer Mesunas, under HALT, would remain in the general population of incarcerated individuals immediately after their assaults.

289. As reduced segregated confinement sentences implemented after the NYCLU settlement have emboldened violent misconduct by incarcerated individuals, the removal of certain incarcerated individuals from ever qualifying for segregated confinement and the three- and

fifteen-day maximum segregated confinement penalty for all other incarcerated individuals will only further lead to violence by incarcerated individuals on staff and rule-abiding incarcerated individuals.

290. Under HALT, violent or lewd offenses, and offenses that do not cause serious injury, will result in segregated confinement for no more than three days.

291. E.W., who split a mouth full of blood and saliva on Plaintiff Tompkins (discussed above), would receive a maximum penalty of three (3) days in segregated confinement before being diverted to the congregate setting of an RRU.

292. Incarcerated individual C.T., who threw feces and urine in the face of Plaintiff Voitsekhovski (discussed above), would receive a maximum penalty of three (3) days in segregated confinement before being diverted to the congregate setting of an RRU.

293. After incarcerated individual C.T. violently assaulted Plaintiff Voitsekhovski four months later, incarcerated individual C.T. would only have received a maximum of fifteen (15) days in segregated confinement before being diverted to the congregate setting of an RRU.

294. Simple assaults on staff that do not cause serious injury only warrant three (3) days in segregated confinement, which demonstrate to other incarcerated individuals that they can challenge security staff and get away with it so long as they do not seriously injure the officer. The slap in the face to Sgt. Hannah, as discussed above, would, at most, warrant three (3) days in segregated confinement, despite the entirely unprovoked and unnecessary action. The assault and attempted sexual assault on Officer Hayes may only warrant three (3) days in segregated confinement, because it was thwarted before causing her serious physical injury.

295. Upon information and belief, this creates a shift in being able to manage and facilitate cooperation by incarcerated individuals in the correction process.

296.    When an officer is frisking an incarcerated individual, the officer is in a disadvantaged, close-proximity position, which has too often led to injuries when an incarcerated individual who possesses contraband and knows he is about to get caught comes off the wall and assaults staff. An incarcerated individual similarly situated now can resist the frisk, so long as he does not injure the staff member and only receive a maximum of three (3) days in segregated confinement before being diverted to the congregate setting of the RRU.

297.    Upon information and belief, incarcerated individuals who deliberately engage in lewd offenses like exposure of their genitals or public masturbation in front of staff of the opposite gender will only receive a maximum of three (3) days in segregated confinement before being diverted to the congregate setting of an RRU.

298.    Such lewd acts are the function equivalent of workplace violence and sexual harassment and cause extreme discomfort to staff and should be treated as such.

299.    HALT is silent in the use of segregated confinement for incarcerated individuals who are gang affiliated and need to be separated from other gang members in scenarios that would otherwise cause significant safety concerns.

300.    Gang members will fill up the RRUs and continue their attempted dominance of housing units there. They will be able to further communicate and trade in contraband and execute assaults on incarcerated individuals and staff against whom they seek retribution.

301.    Plaintiff Hannah is the supervisor overseeing the construction of the A-Block RRU at Southport Correctional Facility, as mandated by HALT.

302.    Upon information and belief, the Southport RRU will hold approximately 42 incarcerated individuals disbursed between five classrooms. All of the incarcerated individuals in RRU will have just served, at most, fifteen days in segregated confinement for serious violent

offenses. They will then be placed in a congregate setting with other incarcerated individuals and staff, and, based on Plaintiff Hannah's training and experience in corrections, many of them, particularly those with gang affiliations, will maintain a propensity for violence towards others.

303.   HALT also fails to provide and establish Step-Down Units that were provided for by the December 2020 regulations promulgated by Defendant DOCCS.

304.   Upon information and belief, Step-Down Units will no longer be a segregated confinement alternative and all incarcerated individuals, regardless of concerns for safety and security, will be placed in an RRU.

305.   The purpose of the Step-Down Units are to provide for a more secure alternative to the RRU for those incarcerated individuals who refuse to engage in peaceful and compliant completion of the RRU rehabilitative programming. For those incarcerated individuals in the RRU who would have continued to engage in violent or disruptive behavior in the RRU, they would have been further diverted to the Step-Down Unit for the safety of those incarcerated individuals in congregate settings in the RRU and staff members charged with ensuring the safety of the RRU.

306.   Upon information and belief, pursuant to HALT, those incarcerated individuals who engage in misbehavior in the RRU, no matter how violent or dangerous, will have nowhere else to be confined, and will serve out the remainder of their statutorily-shortened disciplinary sanctions in the most congregate setting possible until being returned to general population.

307.   Upon information and belief, HALT will prevent security staff from separating violent criminals from themselves and from the population of rule-abiding incarcerated individuals in perpetuity and there will be no substitute disciplinary or corrective tools to provide for security in the facilities.

308.    Upon information and belief, the statistics regarding assaults on staff and incarcerated individuals will continue to rise and result in serious injury and/or death.

309.    Defendants have implemented such extreme 'alternatives' to segregated confinement, to the benefit of the most violent incarcerated individuals in prison, and at the expense of safety of Correction Officers, Correction Sergeants and rule-abiding incarcerated individuals.  Indeed, there is no substantial countervailing interest that excuses Defendants from providing for the decent care and protection of its employees and rule-abiding incarcerated individuals.

## CLASS ALLEGATIONS

310.    The Individual Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 (a) and 23 (b)(1), (2) and (3) on behalf of themselves and all others similarly situated, specifically, all Correction Officers and Correction Sergeants employed by Defendant DOCCS.

311.    This proposed class is so numerous that joinder of all members is impractical.  Upon information and brief, the proposed class of Correction Officers and Correction Sergeants employed by Defendant DOCCS contains approximately eighteen thousand (18,000) members.  The number of Correction Officers and Correction Sergeants employed by Defendants DOCCS who have been, or during the course of this action will be, harmed pursuant to Defendants' laws, rules, regulations, policies, practices and/or customs complained of within, is difficult to ascertain and, upon information and belief, will number in the thousands.

312.    There are questions of fact and law common to the proposed class that predominate over any questions affecting only the named Plaintiffs.  Questions of fact and law include, but are not limited to:

a. Whether Defendants' laws, rules, regulations, policies, practices and/or customs limiting the use of segregated confinement has knowingly created and/or increased workplace danger beyond what is inherent in the profession.

b. Whether Defendants' laws, rules, regulations, policies, practices and/or customs related to entering and implementing the NYCLU settlement, including codifying the settlement via regulation, has knowingly created and/or increased workplace danger beyond what is inherent in the profession.

c. Whether Defendants' enactment and implementation of HALT has knowingly created and/or will create increased workplace danger beyond what is inherent in the profession.

d. Whether Defendants' laws, rules, regulations, policies, practices and/or customs restricting segregated confinement for the most violent offenses to a maximum of fifteen days after a disciplinary proceeding has knowingly created and/or will create increased workplace danger beyond what is inherent in the profession.

e. Whether Defendants' laws, rules, regulations, policies, practices and/or customs prohibiting segregated confinement for incarcerated individuals who are age 21 or younger, and who are age 55 and older has knowingly created and/or will create increased workplace danger beyond what is inherent in the profession.

f. Whether Defendants' laws, rules, regulations, policies, practices and/or customs not addressing the need for segregated confinement of gang affiliated

has knowingly created and/or will create increased workplace danger beyond what is inherent in the profession.

g.   Whether Defendants laws, rules, regulations, policies, practices and/or customs in enacting and implementing RRUs as alternative programs to segregated confinement has knowingly created and/or will create increased workplace danger beyond what is inherent in the profession.

h.   Whether Defendants' laws, rules, regulations, policies, practices and/or customs have collectively knowingly created or increased workplace danger beyond what is inherent in the profession.

i.   Whether Individual Plaintiffs and class member are at imminent risk of irreparable harm, i.e., serious bodily injury or death, if Defendants are allowed to continue the complained of policies, practices and/or customs.

j.   Whether the Individual Plaintiffs and class members are entitled to a declaration that Defendants have, through their continuous and ongoing actions, knowingly invaded their constitutional right to be safe from state-created danger.

k.   Whether the Individual Plaintiffs and class members are entitled to a declaration that Defendants have, through their continuous and ongoing actions, knowingly invaded their constitutional right to be safe from governmental policies that increase the risk of harm including possible death.

l.   Whether the Individual Plaintiffs and class members are entitled to injunctive relief restraining Defendants from continuing the complained of laws, rules, regulations, policies, practices and/or customs.

m. Whether the Individual Plaintiffs are entitled to attorneys' fees under Section 1983.

313.     The claims of the Individual Plaintiffs are typical of the claims of the class. All members of the class sustained, or are in substantial and imminent risk of sustaining, injuries arising out of and caused by Defendants' ongoing and continuous laws, rules, regulations, policies, practices and/or customs that have knowingly created or enhanced danger in the workplace beyond what is inherent in the profession.

314.     The Individual Plaintiffs will fairly and adequately protect the interests of all the members of the proposed class because they have the requisite personal interest in the outcome of this litigation, have no interest antagonistic to the others in the proposed class, and they are represented by a law firm competent and experienced in representing the interests of Correction Officers and Correction Sergeants for over twenty years.

315.     Further, this action is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 (b)(1) because prosecuting separate actions by or against individual class members would create a risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for the party opposing the class; and (2) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

316.     Further, this action is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate injunctive relief or corresponding declaratory relief

with respect to the Individual Plaintiffs and the class as a whole. The class members are entitled to injunctive relief to end Defendants' laws, rules, regulations, policies, practices and/or customs.

317.    Further, this action is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 (b)(3) because questions of law or fact common to class members overwhelmingly predominate over any questions affecting only individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the issues raised herein.

318.    The individual claims of the class members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive, if not totally impossible, to justify individual actions.

319.    Class treatment will allow a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently and economically without the unnecessary duplication of effort and expense if these claims were brought individually.

320.    Individual joinder of the parties is impracticable and class members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action.

321.    There are no unusual difficulties that are likely to be encountered in this class action's management because all the legal and factual questions are common to the class members.

322.    Finally, if class treatment of these claims is not available, Defendants will not be deterred. Defendants will continue their wrongful conduct, and will continue to knowingly harm Correction Officers and Correction Sergeants by forcing them to work in an environment where the public employer has knowingly created and/or enhanced the risk of serious bodily harm or death to Correction Officers or Sergeants beyond what is inherent in the profession.

## FIRST CLAIM FOR RELIEF
### (Against Andrew Cuomo)

323.    Petitioners repeat and re-allege paragraphs "1" through "322" as if fully set forth herein.

324.    At all times relevant herein, Governor Cuomo is the head of the State of New York. Accordingly, he is a final policy maker charged with the authority to promulgate rules, regulations and directives relevant to the administration and management of Defendant State including its agencies like Defendant DOCCS.

325.    Defendant Cuomo acted affirmatively when he authorized adopting, promulgating, implementing and/or sanctioning the various laws, rules, regulations, policies, practices and/or customs, as described above, including signing into law the HALT Act on March 31, 2021.

326.    Defendant Cuomo knew or should have known that adopting, promulgating, implementing and/or sanctioning the various laws, rules, regulations, policies, practices and/or customs, as described above, created a substantial and unreasonable risk of injury to Plaintiffs, including that of death, which is beyond the risks inherent in the profession.

327.    Defendant Cuomo demonstrated a deliberate indifference to Plaintiff's right to be free from state-created dangers from third parties in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendant Cuomo is liable under Section 1983.

328.    As a direct and proximate result of this conduct, Plaintiffs have suffered and will continue to suffer a constitutional deprivation and irreparable harm, resulting in serious and permanent injuries or losses as specified herein from the actions of incarcerated individuals.

329.    The actions of Defendant Cuomo shock the contemporary conscience because of the unjustifiable risk from third party incarcerated individuals to the life and safety of the employees of the State of New York beyond the risks inherent in the profession.

## SECOND CLAIM FOR RELIEF
### (Against the State and DOCCS)

330.    Petitioners repeat and re-allege paragraphs "1" through "329" as if fully set forth herein.

331.    The Fourteenth Amendment guarantees a substantive due process right to be free from state created dangers.

332.    This constitutionally guaranteed right includes the consequential right to be free from governmental policies that create or increase the risk of serious bodily harm or death from third parties.

333.    At all times relevant herein, Defendants adopted, promulgated, implemented and/or sanctioned various laws, rules, regulations, policies, practices and/or customs, as described above, that knowingly created and/or increased dangers faced by Correction Officers and Correction Sergeants in the workplace and incarcerated individuals housed in the general population of State prisons beyond the risks inherent in the profession.

334.    Said laws, rules, regulations, policies, practices and/or customs exhibit a deliberate indifference to NYSCOPBA members' and the Individual Plaintiffs' safety and constitutional right to be free from dangers in the workplace that are created and/or increased by the public employer in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendants State and DOCCS are liable under Section 1983.

335.    Defendants' actions shock the contemporary conscience because of the unjustifiable risk from third party incarcerated individuals to the life and safety of the employees of the State of New York beyond the risks inherent in the profession.

336.    As a direct and proximate result of this conduct, Plaintiffs have suffered and continue to suffer a constitutional deprivation and irreparable harm, resulting in serious and permanent injuries or losses as specified herein.

**THIRD CLAIM FOR RELIEF**
**(Against Acting Commissioner Anthony Annucci)**

337.    Petitioners repeat and re-allege paragraphs "1" through "336" as if fully set forth herein.

338.    At all relevant times herein, Acting Commissioner Annucci is the head of Defendant DOCCS.   Accordingly, he is a final policymaker charged with the authority to promulgate rules, regulations and directives relative to the administration and management of DOCCS.

339.    Defendant Annucci knew or should have known that adopting, promulgating, implementing and/or sanctioning the various laws, rules, regulations, policies, practices and/or customs, as described above, created a substantial and unreasonable risk of injury to Plaintiffs, including that of death.

340.    Defendant Annucci demonstrated a deliberate indifference to Plaintiff's right to be free from state created dangers in violation of the due process clause of the Fourteenth Amendment to the United States Constitution for which Defendant Cuomo is liable under Section 1983.

341. Defendant's actions shock the contemporary conscience because of the unjustifiable risk from third party incarcerated individuals to the life and safety of employees of the State of New York beyond the risks inherent in the profession.

342. As a direct and proximate result of this conduct, Plaintiffs have suffered and continue to suffer a constitutional deprivation and irreparable harm, resulting in serious and permanent injuries or losses as specified herein.

## IRREPARABLE HARM

343. If Defendants' ongoing and continuous laws, rules, regulations, policies, practices and/or customs which have knowingly and collectively created and increased dangers continue, Plaintiff NYSCOPBA's members and class members will be subjected to real, immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiff class will suffer continued violations of their rights under the Fourteenth Amendment to the United States Constitution.

**WHEREFORE**, Plaintiff NYSCOPBA, on behalf of its members, and Plaintiffs Hanna, Hayes, Mesunas, Montgomery, Tompkins and Voitsekhovski, individually and on behalf of class members, respectfully pray that this Court:

(a) Certify this action as a class action on behalf of the proposed class pursuant to Rules 23 (a) and 23 (b) of the Federal Rules of Civil Procedure, consisting of a class of all persons who are subject to Defendants' constitutionally impermissible policies, practices and/or customs described herein;

(b) Declare that Defendants' laws, rules, regulations, policies, practices and/or customs described herein have deprived the Individual Plaintiffs and class

members of their rights under the Fourteenth Amendment to the United States Constitution;

(c)  Order all appropriate injunctive relief as warranted, including, but not limited to, ordering Defendants to immediately cease violations of all Plaintiffs' rights;

(d)  Order that Defendants immediately cease violations of Plaintiffs' rights by enjoining Defendants from implementing the Humane Alternatives to Long-Term Solitary Confinement Act ("HALT");

(e)  Order that Defendants immediately cease violations of Plaintiffs rights by enjoining Defendants from enforcement policies, procedures and/or customs limiting the use of segregated confinement pursuant to the NYCLU settlement and the regulations adopted by Defendants therefrom;

(f)  Order monitoring of Defendants' conduct regarding continued implementation of such injunctions;

(g)  Award reasonable attorneys' fees and costs to be paid by Defendants pursuant to 42 U.S.C. § 1983; and

(h)  Grant such other and further relief as the Court deems just and equitable.

Dated:   May 7, 2021

LIPPES MATHIAS WEXLER
FRIEDMAN LLP
*Counsel for Plaintiffs*

By: _____
Emily G. Hannigan, Esq.
54 State Street, Suite 1001
Albany, NY 12207
Telephone: (518) 462-0110

By: _____
Gregory T. Myers, Esq.
54 State Street, Suite 1001
Albany, NY 12207
Telephone: (518) 462-0110